J-S05007-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| APEX BANK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN R. KNOX AND MONA Y. KNOX | : | |
| | : | |
| Appellants | : | No. 465 WDA 2022 |

Appeal from the Order Entered March 28, 2022
In the Court of Common Pleas of Somerset County Civil Division at
No(s): No. 480 Civil 2018

| APEX BANK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN R. KNOX AND MONA Y. KNOX | : | |
| | : | |
| Appellants | : | No. 466 WDA 2022 |

Appeal from the Order Entered March 28, 2022
In the Court of Common Pleas of Somerset County Civil Division at
No(s): 653 Civil 2018

BEFORE: BENDER, P.J.E., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED: MAY 11, 2023**

Appellants, John R. Knox and Mona Y. Knox, appeal at 465 WDA 2022 from the trial court's March 28, 2022 order entered at trial court docket 480 Civil 2018 ("480"), dismissing with prejudice Appellants' Petition for Rule to Show Cause Why Settlement Agreement Should Not Be Enforced. In addition, Appellants appeal at 466 WDA 2022 from the trial court's March 28, 2022 order entered at trial court docket 653 Civil 2018 ("653"), which likewise

dismissed with prejudice Appellants' Petition for Rule to Show Cause Why Settlement Agreement Should Not Be Enforced.[1]  After review, we affirm.

At trial court docket 480, Appellee — Apex Bank ("Apex") — initiated a mortgage foreclosure against Appellants as to real property situated at 130 Large Street, Meyersdale, Somerset County, Pennsylvania.  **See** Trial Court Opinion at No. 480 ("TCO I"), 8/2/22, at 1.  At trial court docket 653, Apex initiated a mortgage foreclosure against Appellants as to real property situated at 2 Center Street, Meyersdale, Somerset County, Pennsylvania.  **See** Trial Court Opinion at No. 653 ("TCO II"), 8/2/22, at 1.  On December 7, 2020, judgments in mortgage foreclosure were entered for both properties.  When judgment was entered, the amount due to Apex with respect to the real property at 130 Large Street was (i) $15,670.55 in principal; (ii) $3,359.81 in accrued and unpaid interest; (iii) escrow advances in the sum of $3,349.49; (iv) late charges in the sum of $509.88; (v) attorneys' fees, costs, and expenses; and (vi) all other sums provided for under the loan documents. With respect to the real property at 2 Center Street, the amount due was: (i) $32,052.60 in principal; (ii) $3,505.70 in accrued and unpaid interest; (iii) escrow advances in the sum of $3,033.40; (iv) late charges in the sum of $444.78; (v) attorneys' fees, costs, and expenses; and (vi) all other sums provided for under the loan documents.

---

[1] On August 23, 2022, this Court consolidated these appeals *sua sponte*.

On June 7, 2021, writs of execution were issued against each property. Sheriff's sales on the properties were scheduled to take place on November 19, 2021.

About a week before the sheriff's sales were to take place, Appellants' counsel emailed Apex's counsel on November 11, 2021, stating, in relevant part:

> [Appellants] have been back in touch with me concerning the properties which are the subject of the Somerset County foreclosure case Nos. 480 of 2018 (130 Large Street) and 653 of 2018 (2 Center Street).
>
> [Appellants] were inquiring about the amounts necessary to bring current or payoff the above properties, and whether Apex would negotiate the final payoff amounts. [Appellants] have received statements from Apex; however, when they brought current [a third property not at issue in this appeal], the statements that they had been receiving from Apex were incorrect. Would you be able to get me the "bring current" amounts and the payoffs for those two properties?

*See* Appellants' Exhibit A ("Email Exchange") at 1.[2]

Later that day, Apex's counsel responded to the email, asserting that she would be happy to reach out to Apex about whether it would be possible to reach a resolution with Appellants. A few days later, on November 16, 2021 at 9:21 A.M., Apex's counsel sent the following reply to Appellants' counsel:

---

[2] This exhibit showing the email exchanges between counsel was entered into evidence at the March 22, 2022 hearing on Appellants' petitions. The pages of the exhibit are not numbered.

> I have been in touch with [Apex] about the payoff figures. For loan file no. [redacted], the total payoff is $15,846.58,[3] and … for file no. [redacted], the total payoff is $18,684.86.[4]
>
> Please let us know if your clients are interested/able to payoff these amounts.

*Id.* at 2.

> A little over two hours later, Appellants' counsel sent a response:
>
> Thank you for the information. My clients are agreeable to the payoff amounts. I believe they have been in touch with Apex to arrange for the wiring of the funds to Apex. Hopefully, that will be accomplished later today.
>
> I appreciate your help with bringing these matters to a resolution.
>
> If you need anything further from [*sic*], please let me know.

*Id.*

A minute after Appellants' counsel sent his email, Apex's counsel responded, stating that she "inadvertently omitted our legal fees from October from the amounts…. Both payoff amounts should include an additional $285.00." *Id.* at 3. She then immediately sent another email to Appellants' counsel, thanking Appellants' counsel for his assistance and conveying that she will let Apex know to be on the lookout for Appellants' wire. A moment later, Appellants' counsel asked if the $285 in legal fees were payable to Apex or to counsel directly. Apex's counsel represented that they should be paid to Apex. Appellants wired these legal fees, along with the payoff figures Apex's counsel provided to them, to Apex that day. *See* TCO I at 2; TCO II at 2.

---

[3] This loan file related to the property at 130 Large Street.

[4] This loan file related to the property at 2 Center Street.

The next morning, on November 17, 2021 at 9:11 a.m., Apex's counsel emailed Appellants' counsel, saying that "the payoff numbers that I gave you[,] and that your clients wired[,] were incorrect." Email Exchange at 4. She went on to outline the correct payoff amounts: instead of $15,846.58 for the loan pertaining to 130 Large Street, the payoff amount was $40,998.34; and for the loan relating to 2 Center Street, the payoff amount was $60,321.62, not $18,684.86. She asked Appellants' counsel to advise how he would like to handle the situation, and if his clients are still in a position to pay off the loans.

That afternoon, Appellants' counsel replied, relaying that he was trying to contact his clients. He said he would call Apex's counsel once he was able to discuss the matter with them. Appellants' counsel also requested that the sheriff's sales scheduled for November 19, 2021, be postponed until he finds out how Appellants wanted to proceed. Apex's counsel answered that she would reach out to Apex about postponing the sheriff's sales.

The following morning, on November 18, 2021, Apex's counsel advised Appellants' counsel via email that the sheriff's sales were postponed until December 17, 2021, and that Apex was holding the wires from Appellants. Later that morning, Appellants' counsel replied, indicating that Appellants were in Florida, that one of them was having health issues requiring a trip to the hospital, and that he was still waiting to hear from them on how they wanted to proceed. Apex's counsel responded that Apex "is uncomfortable

with holding the wires and would like to resolve how to post those funds quickly." *Id.* at 10.

Around the close of business that day, after not hearing more from Appellants' counsel, Apex's counsel sent another email to Appellants' counsel, stating that Apex is not accepting Appellants' payments as the full payoff amounts or as the full reinstatement amounts. She further relayed that, in order to cancel the foreclosure sales scheduled for December 17, 2021, Appellants would either have to reinstate or pay in full. Apex's counsel also advised that, unless she received other instruction on how Appellants wished to proceed by the end of the next day (*i.e.*, November 19, 2021), Apex would post the funds to Appellants' accounts.

According to Apex, Appellants never responded to this email. *See* Apex's Brief at 5. Instead, on December 2, 2021, Appellants filed a Petition for Rule to Show Cause Why Settlement Agreement Should Not Be Enforced at both trial court dockets.

A hearing on the petitions took place on March 22, 2022. There, both Appellants testified. When Mr. Knox was asked if he had any reason to believe that the payoff amounts given by Apex's counsel were in error, he answered "[n]ot in the slightest." N.T., 3/22/22, at 12. In offering the $15,846.58 and $18,684.86 payoff amounts, Mr. Knox explained that he thought Apex would "rather have something to settle up and take the amount of money and consider it a payoff. It's not that we haven't done that with other[ loan servicing companies]." *Id.* at 15. On cross-examination, Mr. Knox conceded

that he never signed any sort of written agreement with Apex relating to the emails exchanged in November of 2021. *Id.* at 21-22. He also acknowledged that the November 2021 payment he made for both properties is less than the amount owed for both mortgages. *Id.* at 24. On re-direct examination, he conveyed that, "if you take a look at what was owed of princi[pal], interest, and everything else, it sounded to me like they were willing to settle for 65 cents on the dollar, and that's what they presented." *Id.* at 25.[5]

Mrs. Knox testified that, when her attorney reached out to her about the $15,846.58 and $18,684.85 payoff amounts, she "thought it was a little high. But neither here nor there, I just wanted closure; and that was [Apex's] offer, and we complied. I thought it was the end of the story." *Id.* at 30. She represented that she and Mr. Knox had negotiated with other loan servicing companies regarding loans on other properties they owned, and that those companies accepted lower offers. *Id.* at 31. On cross-examination, Mrs. Knox confirmed that she had not signed any written agreement with Apex in November of 2021. *Id.* at 33.

At the conclusion of the hearing, the trial court dismissed Appellants' petitions with prejudice. In doing so, it opined:

> There was no settlement here. There was no agreement here. There certainly was no settlement agreement. … What this email exchange tells me is that there wasn't a meeting of the minds here. At most, this was a negotiation. The flimsy argument that

---

[5] Despite Mr. Knox's testimony, we note that Apex would be settling for much less than 65 cents on the dollar in accepting Appellants' November 2021 payments as payoffs for both properties.

[Appellants] are putting forth today, in this [c]ourt's opinion, was made possible only by virtue of the fact that there was a bit of a blunder on the part of [Apex's] counsel, which young lawyers sometimes do. And there's a complete lack of integrity on the part of [Appellants'] counsel, a much more experienced lawyer, who no doubt knew better, that tried to take advantage of the mistake. That's a fact. Those are my [f]indings of [f]act.

As a matter of law, this had to be in writing to be enforceable. It's not in writing. … It doesn't satisfy the Statute of Frauds. It doesn't satisfy in writing the formal written settlement agreement [*sic*].

*Id.* at 42-43.

On March 28, 2022, the trial court entered orders at both trial court dockets dismissing Appellants' petitions with prejudice. On April 21, 2022, Appellants filed timely, separate notices of appeal at each docket.[6, 7] The trial court directed Appellants to file Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal. Appellants timely complied. Thereafter, the trial court issued opinions pursuant to Rule 1925(a).

Presently, Appellants raise the following issues for our review:

I. Did the [t]rial court err[] as a matter of law in denying … Appellant[s'] Petition for Rule to Show Cause Why Settlement Agreement Should Not Be Enforced?

   A. Is there competent evidence that the unilateral mistake on the part of Apex [was] within the knowledge of [Appellants?]

_____

[6] In the caption of each notice of appeal, Appellants listed only the trial court docket number at which the appeal was filed.

[7] *See Kramer v. Schaeffer*, 751 A.2d 241, 244-45 (Pa. Super. 2000) (ascertaining that an order denying a motion to enforce settlement is appealable as a final order if settlement occurred after trial).

B. Does the … agreement between the parties satisfy the elements of a valid and enforceable contract?

C. Is the [t]rial [c]ourt's opinion supported by the law or by the facts adduced at the March 22, 2022 hearing on Appellants' Petition to Enforce?

Appellants' Brief at 4-5 (emphasis omitted).[8]

At the outset of our review, we keep in mind the following:

When reviewing a trial court's decision to enforce a settlement agreement, our scope of review is plenary as to questions of law, and we are free to draw our own inferences and reach our own conclusions from the facts as found by the court. However, we are only bound by the trial court's findings of fact which are supported by competent evidence. The prevailing party is entitled to have the evidence viewed in the light most favorable to its position. Thus, we will only overturn the trial court's decision when the factual findings of the court are against the weight of the evidence or its legal conclusions are erroneous.

*Bennett v. Juzelenos*, 791 A.2d 403, 406 (Pa. Super. 2002) (cleaned up).

In addition, we observe that "[t]he enforceability of settlement agreements is determined according to principles of contract law." *Kramer*, 751 A.2d at 245 (citation omitted).

In Appellants' first sub-issue, they contest the trial court's determination that Appellants knew that the initial payoff figures given by Apex's counsel were erroneous, and that they tried to take advantage of the mistake. No relief is due.

This Court has previously explained:

Generally[,] if a mistake is not mutual, but unilateral, and is not due to the fault of the party not mistaken, but to the negligence of the one who acted under the mistake, it affords no basis for relief. On the other hand, when there

_____

[8] We have re-ordered Appellants' sub-issues for ease of disposition.

> is mistake on one side and fraud on the other, relief is available. Likewise, irrespective of active fraud, if the other party knows or has good reason to know of the unilateral mistake, relief will be granted to the same extent as a mutual mistake.
>
> A corollary to the aforementioned principles is the rule that the mistake under scrutiny, as well as the actual intent of the parties, must be clearly proven.

*Id.* at 246 (cleaned up).

Thus, we examine if (1) Apex made a mistake; and (2) if Appellants, or their counsel, knew or had good reason to know of Apex's mistake. As for the former, Appellants argue that Apex did not present any evidence of a mistake in proffering the payoff to them. *See* Appellants' Brief at 23. They say that Apex did not present evidence as to how or why the alleged mistake occurred, or who made the purported mistake (*i.e.*, Apex's counsel or Apex). *Id.*

Based on our review of the record, the trial court's finding that Apex made a mistake is supported by competent evidence. *See Bennett*, *supra*. The email exchange between counsel demonstrates that Apex did not intend to compromise the full payoff amounts. To begin, Appellants' counsel **reached out to Apex**, just about a week before the sheriff's sales were to occur, asking if Apex's counsel could provide the 'bring current' amounts and payoffs for the two properties. When Apex's counsel responded to Appellants' request with the at-issue payoff figures, she did not acknowledge — let alone give an explanation for why — the figures were **substantially** lower than what Appellants actually owed. She made no indication that Apex would accept less than the full amount due in order to settle. Further, as Apex points out, its

- 10 -

counsel "referred to the figures provided as the 'payoff' amounts, which was meant to indicate that these figures are the full amounts owed to make full payment on the [m]ortgages and [n]otes; thus satisfying the judgments entered against … Appellants." Apex's Brief at 14-15 (citations omitted). Moreover, **the very next morning** after Apex's counsel gave the at-issue payoff amounts and Apex received Appellants' wire, Apex's counsel notified Appellants' counsel that the payoff numbers she had given were incorrect. This circumstantial evidence supports that the at-issue payoff figures given by Apex's counsel were a mistake.

With respect to whether Appellants — or their counsel — knew or had good reason to know of Apex's mistake, we again determine that the trial court's finding is supported by competent evidence. Appellants claim that "Apex did not present any evidence of why [Appellants] or [their] counsel should have known that the proffered payoff was a mistake as opposed to an offer in compromise or a negotiated settlement offer to clear four years of litigation off the books before a [s]heriff's [s]ale occurred." Appellants' Brief at 23-24. We disagree. Though Appellants testified at the hearing that they thought Apex offered lower figures because it wanted to settle, their counsel — at the very least —had good reason to know of Apex's mistake. The payoff figures Apex's counsel provided in the email were **significantly** lower than what the full payoff figures actually were, and Apex's counsel did not make

- 11 -

any mention that Apex was discounting the amount due for any reason.[9]

Given that the figures were substantially lower than what they should have

been (by nearly $70,000), and because there were no compelling reasons for

Apex to offer such a major discount to Appellants at this juncture after years

of litigation, Appellants' counsel had good reason to know that Apex's counsel

had made a mistake.[10]  Therefore, we affirm the trial court's orders dismissing

_____

[9] We also reiterate that Appellants' counsel contacted Apex about negotiating the final payoff amounts.  Apex did not reach out to Appellants about settling, which weakens Appellants' theory that Apex wanted to avoid the hassle of the sheriff's sales.  If Apex really wanted to avoid the hassle of the sheriff's sales, it could have reached out to Appellants earlier.

[10] The facts in **Kramer** are distinguishable.  In that case, the plaintiffs were injured in a car accident caused by the defendant, and sued the defendant for injuries they sustained.  The parties proceeded to arbitration, and the plaintiffs received a $10,000 award.  The defendant appealed to the court of common pleas.  Prior to trial, the defendant's insurance company offered the plaintiffs $3,500 to settle the case, but the plaintiffs rejected the offer.  The case went to trial and, although the jury found the defendant liable for the plaintiffs' injuries, it awarded the plaintiffs zero damages.

After trial, a new adjuster from the defendant's insurance company became involved in the case.  Not aware that the case had already been to trial, the new adjuster contacted the plaintiffs' attorney and offered to settle the case for $3,500.  The plaintiffs' attorney accepted.  Four days later, the new adjuster learned that the case had been tried, and advised the plaintiffs' attorney that the insurance company would not be making payment to the plaintiffs.  The plaintiffs subsequently filed a petition to enforce the settlement agreement, which the trial court denied.

The plaintiffs appealed.  This Court reversed the trial court's decision to deny plaintiffs' petition to enforce the settlement agreement.  In doing so, we discerned that the plaintiffs' attorney did not know, or have good reason to know, of the unilateral mistake.  We observed that nothing in the record disclosed that the plaintiffs' attorney "was aware that the second settlement offer was premised upon the fact that the adjuster wanted to settle the case
*(Footnote Continued Next Page)*

with prejudice Appellants' Petition for Rule to Show Cause Why Settlement Agreement Should Not Be Enforced.[11]

Orders affirmed.

Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2023

_____

and avoid trial." **Kramer**, 751 A.2d at 246. We also noted that "it is common practice for a party to offer to settle a case after a jury verdict in order to prevent a successful appeal. Such seems all the more likely in this case where a panel of arbitrators initially awarded the [plaintiffs] $10,000." **Id.** at 247 (footnote omitted).

Here, in contrast to **Kramer**, Appellants' counsel had good reason to know that the figures provided by Apex's counsel were a mistake. Unlike the circumstances in **Kramer**, Appellants' counsel reached out to Apex's counsel about negotiating the final payoff amounts. Prior to that, Appellants point to nothing in the record indicating that Apex wanted to settle the matter to avoid the sheriff's sales. Moreover, the settlement amount offered in **Kramer** was for a lot less than the nearly $70,000 discount Appellants received here. Finally, while the insurance company in **Kramer** had reason to want to prevent a successful appeal, especially in light of the plaintiffs' prior favorable arbitration award, it is less sensical for Apex to accept so much less than the full amounts due at this juncture simply to avoid proceeding with the sales.

[11] In light of our disposition, we need not address Appellants' remaining arguments.